## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>THE STATE OF FLORIDA<br>EX REL. DELIA BELL<br><br>    285 NE 32 Terrace<br>    Homestead, Florida 33033<br><br>v.<br><br>KARL E. CROSS[1]<br>    1841 Harbor Point Circle<br>    Weston, Florida 33327<br><br>TABITHA CROSS<br>    4700 Sheridan Street<br>    Suite B<br>    Hollywood, Florida 33021<br><br>CROSS GARDEN CARE CENTER, LLC<br><br>A/K/A GOLDEN 190, LLC<br><br>    4700 Sheridan Street<br>    Suite B<br>    Hollywood, Florida 33021 | **Case No. 8:16-cv-961-T-27AEP**<br><br>**Second Amended Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 et seq. and the Florida False Claims Act, Fla. Stat. § 68.081 et seq.**<br><br>**Jury Trial Demanded** |

I.  INTRODUCTION

1.  Qui tam Relator Delia Bell ("Bell" or "Relator"), by her attorneys, individually and on behalf of the United States of America and the State of Florida, files this complaint against Defendants Karl Cross and Tabitha Cross in their individual capacities, and Cross Garden Care Center, LLC a/k/a Golden 190, LLC (collectively, "Defendants") to recover damages,

---

[1] Relator named a number of defendants in her original Complaint and First Amended Complaint. Relator will be filing a rule 41 dismissal without prejudice as to all defendants not named in this caption.

SECOND AMENDED *QUI TAM* COMPLAINT

penalties, and attorney's fees for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA") and the Florida False Claims Act, Fla. Stat. § 68.081 *et seq*. ("FFCA").

2. The Center for Medicare and Medicaid Services ("CMS") adheres to a "100 day rule" with respect to patients in skilled nursing facilities ("SNF"). Medicare will – at least partially - cover the costs of patient stays in an SNF for the patient's first 100 days at a facility. Beyond this 100-day period, the patient is required to cover all costs of the stay. *See* Centers for Medicare and Medicaid Services, Medicare Benefit Policy Manual, Chap. 3, Sec. 20.1; available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c03.pdf - last checked July 28, 2019.

3. Karl Cross and Tabitha Cross, in their individual capacities, and the corporate Defendant have designed a company-wide policy that requires their medical staff to keep patients on service for 100 days, across the board. This practice is done without regard to patient welfare or medical necessity and is designed solely to maximize reimbursement from Medicare. When the Defendants submit claims to CMS for payment for unnecessary medical services, they are submitting false claims for payment to the Government and are liable under the FCA and FFCA.

4. When Bell, a former administrator at the Cross Garden Care Center facility ("CGC"), complained about this obvious fraud, Karl Cross insisted on billing Medicare for the unnecessary medical services.

5. Bell, reasonably believing that her continued employment was conditioned upon her continuing to unlawfully bill CMS for unnecessary medical services, resigned her position effective August 27, 2015.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

2

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

7. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732, which authorizes nationwide service of process. Moreover, Defendants transact business in the Middle District of Florida.

8. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the FFCA on the grounds that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.

9. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Middle District of Florida.

## III. THE PARTIES

10. Relator Bell is a citizen of the United States and a resident of Homestead, Florida.

11. Bell is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that her knowledge of the information contained herein has not been publically disclosed.

12. Bell has more than 20-years of experience working in the nursing and healthcare administration industries.

13. Bell worked for several years as a legal consultant, responsible for reviewing hospital records and nursing home records for attorneys.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

3

14. Bell has a Master's in Health Services and Administration from Barry University.

15. Immediately prior to joining the Defendants, Bell worked as the Director of Nursing at Jackson Health System and has held numerous other positions related to the administration of healthcare organizations.

16. Bell began working at CGC in November 2014.

17. Bell resigned her employment with the Defendants effective August 27, 2015.

18. Karl Cross is the founder of Cross Senior Care, a chain of SNF located throughout Florida and with one location in Georgia, including CGC located at 190 NE 191st Street, Miami, FL 33179.

19. CGC was owned by Cross Garden Care Center, LLC ("CGC, LLC"), but is currently owned by an entity formed on June 22, 2016, called Golden 190, LLC.

20. Golden 190, LLC's address is 6511 Nova Drive, Suite 168, Davie, Florida 33317. This address is a UPS store, with the "suite" number being a mailbox in that store.

21. Despite the new corporate ownership, Karl Cross runs CGC even though Joyce Plourde, another administrator of CGC, is listed in regulatory filings as its owner.

22. Karl Cross also employs family members at his facilities. For example, Karl Cross's wife, Tabitha Quetgles Cross, is a nurse at CGC. Medicare reimbursement data reveals that Tabitha Cross billed Medicare for 2,504 nursing facility evaluations, all typically lasting 15 minutes per-patient.

23. These figures place Tabitha Cross seventh in the State of Florida for this type of billing among more than 1,200 providers.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

4

24. Karl Cross and Tabitha Cross reside at 1841 Harbor Point Circle, Weston, Florida 33327.

25. Defendants service a substantial number of Medicare, Medicaid, and TriCare beneficiaries.

26. While each state Medicaid program is run by the individual state, the federal government does provide federal funds to each state Medicaid program. As such, federal dollars are implicated in each claim reimbursed by a state Medicaid program.

27. CGC has annual revenues of approximately $10,000,000, the vast majority of which comes from Medicare and Medicaid.

## IV. REGULATORY BACKGROUND

### A. Government Payors

28. In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. §1395, *et seq.* ("the Medicare program" or "Medicare") authorizing the federal government to pay for the cost of certain medical services for persons aged 65 and older.

29. The United States, through the Department of Health and Human Services ("HHS"), administers the Medicare program.

30. CMS is the organization that administers and manages Medicare.

31. CMS pays for Skilled Nursing Care, which includes, but is not limited to, meals, skilled nursing care, medications, medical supplies, and equipment used in the facility.

32. Section 1888(e) of the Social Security Act provides the basis for the establishment of the per diem Federal payment rates applied under the Prospective Payment System ("PPS") to SNF that received their first payment from Medicare.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

5

33. Before accepting Medicare assignments, providers at CGC, like all providers who submit claims for services provided to Medicare beneficiaries, must certify that it will operate in accordance with the requirements established by the Secretary of HHS.

34. At all times herein mentioned, the Defendants had knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that it must comply with all applicable Federal laws in order for the services Defendants perform to be approved for coverage under Medicare.

35. The State of Florida administers Medicaid services through many facilities, including CGC.

36. TriCare is a federal health care program for the U.S. Department of Defense's Military Health System.

**B.     Skilled Nursing**

37. Skilled nursing services are those services furnished pursuant to physician orders, that: (1) require the skills of qualified technical or professional health personnel such as Registered Nurses ("RN"), Licensed Practical Nurses ("LPN"), physical therapists, occupational therapists, and speech-language pathologists or audiologists; and (2) must be provided directly by or under the general supervision of these skilled nursing or skilled rehabilitation personnel to assure the safety of the patient and to achieve the medically desired result.

38. CMS adheres to the so-called "100 Day Rule." For the first 20 days in a SNF, the resident pays no money out of pocket and all costs are covered by Medicare.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

6

39. For days 21 through 100, Medicare will cover a large percentage of the costs to a resident to stay in an SNF. The first 100 days of SNF coverage are referred to as the "Benefit Period."

40. After day 100, the resident is responsible for all costs.

**C. Rehab Therapy**

41. Rehab therapy is classified by different Resource Utilization Group ("RUG") levels.

42. This rehab category is further broken up into five sub-categories: low (RLx), medium (RMx), high (RHx), very high (RVx), and ultra high (RUx).

43. Generally, patients with a high level of independence are not good candidates for rehab therapy because there is simply no need or rationale for skilled therapy services.

44. In most cases, patients with a high level of independence should not be placed on any type of rehab therapy.

45. Conversely, patients who are extremely sick, unable to participate, and have a poor rehab prognosis are not good candidates for rehab therapy because they are unlikely to have a good outcome from the skilled therapeutic services.

46. Long term nursing care may be more appropriate for extremely sick patients.

47. The RUG level determines the amount of money per day that Medicare will pay for a patient's stay at the facility.

48. Higher RUG levels command higher Medicare reimbursements.

V.      **ALLEGATIONS**

    A.      **Unnecessary Therapy Services**

49.      Bell, an administrator at CGC, reported directly to Karl Cross.

50.      Soon after joining CGC as an administrator, Bell began to notice that many of the facility's residents did not require therapy services and were not eligible for treatment at the SNF.

51.      For example, Patient W.S.[2] suffered from schizophrenia but could easily walk, bathe, and perform other every day functions without any assistance whatsoever.

52.      Reliant Rehabilitation, at the direction of Karl Cross, provided occupational and physical therapy to Patient W.S., despite the fact that Patient W.S. did not suffer from any physical impairment that required therapy services.

53.      CGC, at the direction of Karl Cross, billed Medicare for Patient W.S. Medicare reimbursed CGC for those services. Therefore, CGC submitted a false claim for payment of money to Medicare and Medicare in fact paid for the false claim.

54.      This example is merely an example of the widespread pattern of fraud that Defendants have committed and continue to commit.

55.      Relator personally knows about Patient W.S. because she personally observed W.S.'s treatment.

56.      Patient J.P. is another example of a patient who received unnecessary therapy services.

57.      Patient J.P. was able to ambulate without assistance.

---

[2] Relator is using initials for patient privacy but can identify the patient by name and in most instances by Medicare number.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

8

58. Patient J.P., on numerous occasions, refused the unnecessary therapy services that Reliant Rehabilitation, at the direction of Karl Cross, tried to provide him.

59. Because Patient J.P. refused therapy services, the therapists were unable to take him from his room down to the rehabilitation facility on the first floor. As a result, Tabitha Cross and other practitioners performed bedside therapy on Patient J.P., which amounted to little more than a few minutes of stretching from time to time.

60. CGC, at the direction of Karl Cross, billed Medicare for Patient J.P. Medicare reimbursed CGC for those medically unnecessary services performed by Tabitha Cross and other practitioners. Therefore, CGC submitted a false claim for payment of money to Medicare and Medicare in fact paid for the false claim.

61. This example is merely an example of the widespread pattern of fraud that Defendants have committed and continue to commit.

62. Relator personally knows about Patient J.P. because she personally observed J.P.'s treatment.

**B.    Utilization Reports, Inflated RUG Rates, and the 100 Day Rule**

63. After about a month into her tenure at CGC, Karl Cross required Bell to submit utilization reports to Joyce Plourde.

64. Joyce Plourde, another administrator at CGC, served as Karl Cross's de facto second in command.

65. A utilization report is, essentially, a detailed census of the facility. The utilization report includes the patient's name, treatment regimen, RUG level, insurance information, and the number of days that the patient has spent in the facility.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

9

66. When reviewing the utilization report, Karl Cross routinely wrote e-mails to the effect of, "We need to get these RUG levels up."

67. Bell also began to notice an alarming trend with respect to the timing of resident discharges.

68. As she reviewed the utilization reports, she noticed that Karl Cross and the corporate Defendant kept track of how many days a resident had remaining under Medicare's 100 day Benefit Period.

69. She also noticed that once a patient reached 100 days, CGC, at the direction of Karl Cross, immediately discharged the patient.

70. CGC, at the direction of Karl Cross, refused to discharge any, or virtually any, Medicare patients before they reached the end of the 100 day Benefit Period.

71. In addition, CGC, at the direction of Karl Cross, falsely readmitted patients in order to reset the 100 day Benefit Period.

72. For example, CGC, at the direction of Karl Cross, routinely transferred Patient W.S., who suffered from schizophrenia, to Palmetto Psychiatric Unit for three to four day stays.

73. When Patient W.S. was readmitted to CGC, Karl Cross reset the 100 day Benefit Period.

74. When a patient leaves an SNF but returns within 30 days, the patient is only eligible to continue with the original 100 day Benefit Period. The clock does not reset. In other words, the patient is not entitled to another 100 days beyond that which he has already stayed at an SNF.

75. For Patient W.S., Medicare should not have paid for another 100 days.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

10

76. CGC, at the direction of Karl Cross, and with the participation and assistance of Tabitha Cross, billed Medicare as if Patient W.S. was entitled to another 100 days in the SNF after he spent only a few days at a psychiatric ward.

77. CGC, at the direction of Karl Cross, billed Medicare for Patient W.S.  Medicare paid CGC for those services.  Therefore, CGC submitted a false claim for payment of money to Medicare and Medicare in fact paid for the false claim.

78. This example is merely an example of the widespread pattern of fraud that Defendants have committed and continue to commit.

79. Relator personally knows about Patient W.S. because she personally observed W.S.'s treatment.

80. For the 10 months that Bell worked at CGC, Karl Cross discharged zero or virtually zero Medicare patients, including Patients W.S. and J.P., before they reached the end of their Medicare eligibility period. Most of Defendants' patients should have been discharged earlier but Karl Cross insisted they remain on the full period regardless of need.

81. The following patients, seen directly by or whose care was managed by Tabitha Cross, are merely examples of Defendants' patients that were kept for the entire eligibility period even though their need for care expired well beforehand:

   a. P.G. – Patient P.G. was seen continuously by CGC from March 5, 2015 through July 12, 2015 for 100 days.  Patient P.G. needed only minor care for less than one month.  CGC, at the direction of Karl Cross, billed Medicare continuously over this time period.  Medicare paid close to $24,000 for patient P.G.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

11

  b. I.J. – Patient I.J. was seen for multiple 100 day cycles by CGC from November 17, 2014 through July 31, 2015.  CGC, at the direction of Karl Cross, billed Medicare continuously over this time period including for the unlawful multiple 100 day cycles.  Patient I.J. needed less than 30 days of actual care.  Medicare paid over $37,000 for patient I.G.

  c. C.R. – Patient C.R. was seen for 100 days by CGC from March to June of 2015.  CGC, at the direction of Karl Cross, billed Medicare continuously over this time period.  Patient C.R. needed minimal care for no more than two months.  Medicare paid close to $17,000 for patient C.R.

  d. A.R. – Patient A.R. was seen for multiple 100 day cycles by CGC from November 17, 2014 through July 31, 2015.  CGC, at the direction of Karl Cross, billed Medicare continuously over this time period including for the unlawful multiple 100 day cycles.  Patient A.R. needed less than 30 days of actual care.  Medicare paid closed to $38,000 for patient A.R.

82. Relator has personal knowledge of the above because she personally observed the patients remaining in care far longer than necessary, and often on multiple 100 day cycles, and because she had access to Defendants' records to confirm the accuracy of her personal observation.

83. CGC generates approximately $10,000,000 per year in revenue.  Bell estimates that roughly $6,000,000 of this amount is attributable to Medicare patients.

84. Bell estimates that at least half of the $6,000,000 in Medicare billing is for medically unnecessary services.

### C. Stealing from Medicaid Patients

85. Medicaid patients in Florida receive a small allowance of about $105 per month while in an SNF.

86. For some patients, the amount of money derived from this allowance accumulated to thousands of dollars because patients had no opportunity to spend the funds.

87. In cases such as this, CGC took money out of the patients' individual accounts and placed it in a general facility account.

88. Karl Cross then used the money from this general account to purchase furniture for the SNF.

89. In one example, CGC took money out of Patient W.S.'s account to purchase a new television after his other television became inoperable.

90. While the actual cost of the television was no more than $90, CGC took $400 out of his account to cover the costs.

91. In another case, CGC, specifically Tabitha Cross, refused to provide a patient with Tylenol because the patient was on Medicaid – not Medicare – and Medicaid would not cover the cost of Tylenol.

92. Tabitha Cross routinely changes or discontinues non-formulary medications in order to avoid the cost of the medication through Medicaid.

93. In other cases, nurses complained to Bell that they were prevented from providing therapy services to Medicaid patients because Medicaid reimbursed at a lower level than Medicare for such services.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

13

D. **Bell's Resignation**

94. Frustrated by Karl Cross's refusal to treat Medicaid patients and the rampant Medicare fraud assisted by Tabitha Cross, Bell resigned her position in April 2015 to become effective at the end of May 2015.

95. In what was to be her last week of employment, Karl Cross asked that she remain on for another three months so that he could find a replacement.

96. Bell agreed to remain on service for three months, but resigned on August 27, 2015.

97. At the time of her resignation, Karl Cross and Tabitha Cross were continuing their scheme to defraud Medicare.

## COUNT I
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (Against All Defendants)

98. Relator realleges and incorporates by reference the allegations contained in paragraphs 1-97 above as though fully set forth herein.

99. The FCA imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

100. CGC, at the direction of Karl Cross, with services performed, at least in part, by Tabitha Cross, knowingly presented or caused to be presented claims to obtain payment for medically unnecessary services in at least four ways:

  a. First, the Defendants provide and bill CMS and Tricare for unnecessary physical and occupational therapy services, specifically those performed by Tabitha Cross

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

14

    for which she is ranked seventh in the State of Florida in terms of services performed.

b. Second, the Defendants falsely inflates RUG rate levels and bill CMS and Tricare at the inflated rates.

c. Third, the Defendants refuse to discharge patients before they reach the end of their 100 day Benefit Period. This means that the Defendants are billing CMS and Tricare for a large percentage of residents, including Patient W.S and Patient J.P., that are ineligible for treatment at an SNF.

d. Fourth, the Defendants inappropriately re-admit patients and reset their 100 day Medicare Benefit Period when patients leave CGC facilities for only a few days at a time.

101. The aforementioned conduct has led and continues to lead the Government – through Medicare and TriCare – to pay for medically unnecessary services, for which Defendants received payments of millions of dollars from the federal programs.

102. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### COUNT II
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (Against All Defendants)

103. Relator realleges and incorporates by reference the allegations contained in paragraphs 1-97 above as though fully set forth herein.

SECOND AMENDED *QUI TAM* COMPLAINT
United States ex rel. Delia Bell v. Karl Cross, et. al.

15

104. The FCA imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).

105. CGC, at the direction of Karl Cross, with services being performed, at least in part, by Tabitha Cross, knowingly made or caused to be made a false record or statement to a false claim when they created false narratives in patient notes to justify their decision to provide services in excess of what is medically necessary.

106. The result of Defendants' actions has led the Government to pay for medically unnecessary services, for which Defendants received payments of millions of dollars from the federal programs.

107. The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

### COUNT III
### Violations of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)
### (Against All Defendants)

108. Relator realleges and incorporates by reference the allegations contained in paragraphs 1-97 above as though fully set forth herein.

109. The FFCA imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.  Fla. Stat. § 68.082(2)(a).

110. CGC, at the direction of Karl Cross, with services being performed by Tabitha Cross, violated the FFCA by appropriating patient allowances and using those funds to purchase furniture and equipment for their facilities.

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

16

111.  The result of CGC, Karl Cross, and Tabitha Cross's actions has led the State of Florida to pay for medically unnecessary devices and supplies, for which Defendants received payments from Medicaid.

112.  The State of Florida has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## PRAYER FOR RELIEF

WHEREFORE, Relator Bell, acting on behalf of and in the name of the United States of America, the State of Florida, and on her own behalf, prays that judgment will be entered against Defendants for violations of the FCA and the FFCA as follows:

a) That for violations of the FCA, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $21,563 for each and every violation alleged herein, or for violations occurring on or prior to November 2, 2015, the maximum penalty of up to $11,000;

b) That for violations of the FFCA, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of the Defendants' actions, plus a civil penalty of $11,000 for each act in violation of Fla. Stat. § 68.081, *et seq*;

c) That Relator Bell be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d), including the costs and expenses of this action and reasonable attorney's fees; and

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

17

d) That the United States Government, State of Florida, and Relator Bell receive all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Bell hereby demands a jury trial.

Dated:  July 28, 2019.

        Respectfully submitted,

        *s/ Sean Estes*
        Sean Estes
        Florida Bar No.: 055770
        sestes@jameshoyer.com
        Jesse L. Hoyer
        Florida Bar No.: 076934
        jlhoyer@jameshoyer.com
        JAMES HOYER, P.A.
        2801 West Busch Blvd., Suite 200
        Tampa, FL 33618
        Tel: (813) 375-3700 / Fax: (813) 375-3710

        *Local Counsel for Relator*

        David Scher, *pro hac vice*
        District of Columbia Bar No. 474996
        dave@jameshoyer.com
        JAMES HOYER, P.A.
        1300 I Street, N.W., Suite 400E
        Washington, DC  20005
        Tel: (202) 975-4994 / Fax: (813) 375-3763

        R. Scott Oswald, *pro hac vice*
        soswald@employmentlawgroup.com
        THE EMPLOYMENT LAW GROUP, P.C.
        888 17th Street, NW, Suite 900
        Washington, D.C. 20006
        Tel: (202) 331-2803 / Fax: (202) 261-2835

        *Co-counsel for Relator*

SECOND AMENDED *QUI TAM* COMPLAINT
*United States ex rel. Delia Bell v. Karl Cross, et. al.*

18

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing was served by CM/ECF on July 28, 2019 on all counsel or parties of record on the attached service list.

                                *s/ Sean Estes*
                                Sean Estes