UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE UNITED STATES OF AMERICA,
THE STATE OF FLORIDA, ex rel.
DELIA BELL,

    Plaintiffs/Relator,

v.                                        Case No: 8:16-cv-961-T-27AEP

CROSS GARDEN CARE CENTER, LLC,
and KARL E. CROSS,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** are Defendants' Motion to Strike Relator Bell's Declaration (Dkt. 174), Bell's Opposition (Dkt. 176), Bell's Motion for Partial Summary Judgment (Dkt. 171), Defendants' Opposition (Dkt. 175), and Defendants' Motion for Summary Judgment (Dkt. 177), and Bell's Opposition (Dkt. 183). Upon consideration, Defendants' motion for summary judgment is **GRANTED**. The remaining motions are **DENIED**.

I.      **BACKGROUND AND UNDISPUTED FACTS**

This action alleges that a skilled nursing facility submitted claims to the Centers for Medicare and Medicaid Services (CMS) in violation of the False Claims Act (FCA). Defendant Karl Cross ("Cross") was an authorized signatory of Cross Senior Care II, LLC, which owned Cross Garden Care Center (CGCC), a skilled nursing facility.[1] (Dkt. 177-1 at pp. 35-38); (Dkt.

---

[1] Bell alleges that Defendant Cross Garden Care Center, LLC owned CGCC. (Dkt. 127-2 ¶¶ 17-19); *see also* (Dkt. 177-1 at p. 24). Any dispute as to CGCC's ownership is immaterial to the determination that summary judgment in Defendants' favor is warranted.

1

171-4). Relator Delia Bell is a registered nurse who worked at CGCC as a nursing home administrator from November 2014 to August 2015. (Dkt. 177-4 ¶¶ 1-2).

Medicare covers "post-hospital extended care services for up to 100 days during any spell of illness," including at a skilled nursing facility. (Dkt. 177-2 ¶ 6); 42 U.S.C. § 1395d(a)(2)(A); *see also Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1094-95 (11th Cir. 2020) (explaining Medicare coverage of skilled nursing services). For coverage to apply, the patient must have been inpatient at a hospital for at least three consecutive days and transferred to the skilled nursing facility within 30 days after discharge. (Dkt. 177-2 ¶¶ 19-20); 42 C.F.R. § 409.30. Coverage ends when the 100-day benefit period expires or the patient no longer requires skilled care. (Dkt. 177-2 ¶¶ 21-22). The benefit period can be reset only if the patient has an uninterrupted 60-day period of wellness without skilled care.[2] (Id. ¶ 23); (Dkt. 177-3 at pp. 125-28). During Bell's employment at CGCC, a patient's attending physician and CGCC's interdisciplinary care team, which did not include Bell, determined "how long [the] patient should be in . . . care."[3] (Dkt. 177-1 at pp. 20-21); *see also* (Dkt. 177-2 ¶ 12).

Qualifying treatment at a skilled nursing facility is reimbursed through a per diem prospective payment system. (Dkt. 177-2 ¶¶ 6, 8); 42 C.F.R. § 413.335(a). The payment rate, as well as service frequency, variety, and duration devoted to a patient, are determined by the patient's RUG score. (Dkt. 177-2 ¶¶ 9-10). Higher RUG scores have higher reimbursement rates. (Id. ¶ 9).

---

[2] The parties dispute whether a skilled nursing facility must obtain approval from CMS to reset the benefit period. *See* (Dkt. 177-2 ¶ 23); (Dkt. 177-3 at pp. 125-28). This dispute is immaterial to the determination that summary judgment in Defendants' favor is warranted.

[3] Bell purports to dispute this by asserting that Resource Utilization Group ("RUG") levels were "arbitrarily manipulated by Cross, and Joyce Plourde, to keep patients in treatment far longer than medically necessary." (Dkt. 183 at p. 3). To the extent this constitutes a factual dispute about the role of CGCC's interdisciplinary care team, the dispute is immaterial to the determination that summary judgment in Defendants' favor is warranted.

During Bell's employment, CGCC's interdisciplinary care team and a patient's attending physician determined the patient's RUG level. (Id. ¶¶ 12, 25-26); (Dkt. 177-1 at pp. 19-21).

The information necessary to determine a patient's RUG score is gathered by completing a Minimum Data Set (MDS) report, prepared by "multiple professionals and contain[ing] extensive information on a patient's nursing needs, ADL impairments,[4] cognitive status, behavioral problems, and medical diagnoses." (Dkt. 177-2 ¶¶ 14-15). To seek reimbursement for services, skilled nursing facilities must submit MDS assessments and billing forms to Medicare payment processors. (Id. ¶ 17). Skilled nursing facilities must assess RUG scores and complete an MDS report on the 5th, 14th, 30th, 60th, and 90th days of a patient's stay. (Id. ¶ 16). During 2014 and 2015, Plourde was an "MDS consultant for Cross Gardens Care Center, LLC." (Id. ¶ 2). Bell was not involved in the creation of MDS reports. (Id. ¶ 24); (Dkt. 177-3 at pp. 40-41).

Additionally, CGCC's patients were assessed by a therapy company which determined whether a patient required therapy.[5] (Dkt. 177-3 at pp. 73-74). Bell is not a licensed therapist or medical doctor and does not have the "ability to order therapy or write prescriptions." (Id. at p. 74). And she was never involved in CGCC's billing or saw a bill submitted to Medicare. (Id. at pp. 27-29). After she resigned from CGCC, she filed suit. *See* (Id. at pp. 120-21); (Dkt. 1).

---

[4] "ADL" refers to a person's capacity to perform activities of daily living, such as bed mobility, toilet use, and eating. *See United States v. Life Care Centers of America, Inc.*, 114 F. Supp. 3d 549, 552 (E.D. Tenn. 2014). At CGCC, ADL scores were determined by "[r]ehab and nursing." (Dkt. 177-1 at p. 20). "Rehab" was "contracted." (Id.).

[5] As Bell explained,

> The therapist will do an evaluation or assessment and then they will create or come up with some type of plan of care. And then on a day-to-day basis, or at least on a weekly basis, they would have to reevaluate if the resident is still responding to the therapy or is meeting the plan of care. . . . The doctor signed off on the plan of care.

(Dkt. 177-3 at pp. 21-22).

3

*Pending Claims*

Bell's only remaining count alleges that Defendants knowingly presented or caused to be presented false claims for payment in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), by billing unnecessary therapy services, falsely increasing RUG levels, unnecessarily retaining patients for 100 days, and improperly resetting benefit periods. (Dkt. 127-2 ¶¶ 87-90).[6] Defendants move to strike Bell's declaration and for summary judgment. (Dkts. 174, 177). Bell moves for summary judgment "on liability and damages . . . with respect to . . . seven (7) patients." (Dkt. 171 at p. 1).

## II.   STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (citation omitted). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials on file, that there are no genuine disputes of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citation omitted). If the movant adequately supports its motion, the burden shifts to the nonmoving party to show specific facts that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The evidence presented

---

[6] Count II, which alleged a violation of § 3729(a)(1)(B) for making a false record or statement to a false claim, and Count III, which alleged a violation of Fla. Stat. § 68.082(2)(a), were previously dismissed. (Dkt. 123). As to the FCA counts, following several extensions of time, the United States declined to intervene. (Dkts. 6, 12, 16, 19, 24, 28, 32). As to Count III, the State of Florida declined to intervene. (Dkt. 31). Several defendants, including the company which provided therapy to CGCC's patients, have been dismissed from the action. (Dkts. 98, 118).

must be viewed in the light most favorable to the nonmoving party. *Ross v. Jefferson Cty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cty., Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable," *Marshall v. City of Cape Coral, Fla.*, 797 F.2d 1555, 1559 (11th Cir. 1986).

## III. DISCUSSION

In summary, even if Bell's declaration is considered, she has failed to rebut Defendants' showing of the absence of a genuine issue of material fact as to her FCA claim. The FCA imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.[7] 31 U.S.C. § 3729(a)(1)(A). "To establish a cause of action under the [FCA], a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005); *see also United States v. AseraCare, Inc.*, 938 F.3d 1278, 1284 (11th Cir. 2019) ("To prevail on an FCA claim, the plaintiff must prove that the defendant (1) made a false statement, (2) with scienter, (3) that was material, (4) causing the Government to make a payment."). Bell has not established that a genuine issue of material fact exists as to whether Defendants knowingly submitted a false claim or made a false statement with scienter.

---

[7] Section 3729(a)(1)(A) allows "two theories of liability: (1) a presentment theory and (2) a cause to be presented theory." *Ruckh*, 963 F.3d at 1106. Summary judgment in Defendants' favor is warranted as to either theory.

*A False Claim or Statement*

Bell has not shown that Defendants submitted a false claim or made a false statement. At best, she has demonstrated an unsupported difference of opinion as to the treatment of patients between her and Defendants' interdisciplinary care team, attending physicians, and a therapy company, which is insufficient under the FCA. *See, e.g.*, *AseraCare, Inc.*, 938 F.3d at 1297. To support her allegations of unnecessary medical services and inflated RUG levels, she relies on Cross' deposition, Plourde's affidavit, "resident account detail" documents with billing information produced by Defendants, a spreadsheet provided by the United States which compiles billing statistics of unidentified patients, and her deposition and declaration. (Dkt. 183 at p. 2). In short, no evidence establishes that Defendants filed a false claim or made a false statement in connection with a claim.

During her deposition, Bell acknowledged that she never saw a CGCC bill or MDS report and had no information that a specific patient's Medicare eligibility was improperly reset or that RUG scores were manipulated. (Dkt. 177-3 at pp. 34-37, 128). And although she testified that Cross sent her emails questioning RUG scores, she does not know if RUG scores were changed after the emails. (Id. at pp. 39-41). Further, she recalled only one patient who received purportedly unnecessary treatment. (Id. at pp. 55, 73). However, she fails to support her conclusion that he did not require therapy because he "did not los[e] his ability to walk." (Id. at p. 73). And she acknowledged that he was assessed by a therapy company that concluded he needed therapy.[8]

---

[8] Bell testified as follows:

> Q: Do you know if he was assessed by the therapy company?
> A: Of course.
> Q: And the therapy company concluded that he was in need of therapy?

Although she "disagree[d]" with the company's assessment that the patient required therapy, she acknowledged that she is not a licensed therapist or medical doctor and does not have the "ability to order therapy or write prescriptions." (Id. at p. 74). Further, although Bell testified that the patient's benefit period was reset, she acknowledged that a physician had determined that he should visit a hospital and return to CGCC. (Id. at pp. 71-73).

In Bell's subsequent declaration, she avers that she "observed on many occasions that CGGC [sic] would keep patients in residence far longer than was needed" and that patients were "often treated to far more excessive therapy than they needed or could tolerate." (Dkt. 177-4 ¶ 3). She avers that she "brought [her] concerns to Joyce Plourde in or around early 2015," that Plourde "responded that this is just how Cross operates and refused to make any changes," and that "[o]n at least one occasion, Mr. Cross questioned a patient's RUA rug level angrily and directed me to increase the RUG level of the patient, without any analysis or justification." (Id. ¶¶ 4, 5). Bell further avers that, as to seven patients, therapy was not "indicated."[9]

---

> A: I would imagine, because if they continued to – see, the process is they would have to assess him and then do an evaluation and then come up with a plan of treatment. Then –
> Q: Then the doctor would approve that plan of treatment and order the therapy, correct?
> A: Yes.
> Q: So at least the therapy company and the doctor believed that the therapy provided to [the patient] was necessary, right?
> A: That is according to them, yes.

(Dkt. 177-3 at pp. 73-74).

[9] As to the seven patients, Bell specifically avers the following:

- P.G "could do everything he could at the level he was at and therefore could not improve. As such, no therapy at all was indicated nor was spending 52 days at CGGC [sic]. Thus 100% of the Defendants' billing to Medicare for any and all RUG level treatments for this patient are false."
- A.R. "could not tolerate any therapy. As such, no therapy at all was indicated. Eventually, the family intervened and removed her because she was being overtreated. Thus 100% of the Defendants' billing to Medicare for any and all RUG level treatments for this patient are false and the entire 100 days billed to Medicare is false."
- C.Y. "was improperly placed on very high RUG levels. . . . He was placed on very high RUG

However, Bell does not provide evidence, such as testimony from a licensed physician or therapist, supporting her assertion that the patients received unnecessary therapy or that their RUG scores were improperly increased. And although Bell is a nurse, she acknowledged that she cannot order therapy or prescriptions, and she does not provide patient medical records to support her independent determination that the level of treatment provided was "not indicated."[10] Further,

---

    therapy that would be impossible to implement, painful and unnecessary. There was no plan of care and no specific treatment path that made sense for CY, yet his RUG levels were maxxed [sic] out when there should have been no therapy at all. Thus 100% of the Defendants' billing to Medicare for any and all RUG level treatments for this patient are false and the entire 100 days billed to Medicare is false."

- JCJL's treatment was "pointlessly increas[ed] . . . even though he could not improve any longer. There was no goal, just forced treatment at higher RUG levels – even though the only issue was mental behavior. Thus all billing after the first 60 days is false."
- J.P. "is totally alert and stable. Treatment was unnecessary and the patient was in effect living at CGGC unlawffully [sic]. Instead of discharging, CGGC maxxed [sic] out RUG levels at the end of available Medicare days, just to bill. All Medicare billing after the first 60 days for this patient is false."
- W.S. "was originally on RUG level A then was immediately moved way up to RUG level VA – a very high level – improperly. WS was schitzophrenic [sic] and bipolar but ambulatory and independent. There was no reason for him to receive therapy at all. I observed therapists attempt to try to treat WS just to bill but WS was unreceptive and the treatments were useless because he was self-sufficient. Many therapists complained to me about their inability to treat WS and the lack of need for his treatment. All of CGGC's [sic] therapy billing to Medicare for this patient is false."
- I.J. was "wheelchair bound and needed minimal assistance. She needed little to know [sic] therapy yet was forced onto very high therapy levels for 100 days. There was no goal, just forced treatment at higher RUG levels. Thus all of the Medicare billing for this patient is false."

(Dkt. 177-4 ¶ 10).

Defendants move to strike Bell's declaration, contending that it is a "sham" and does not satisfy Rule 56(c)(4), Fed. R. Civ. P. (Dkt. 174). As the Eleventh Circuit has explained, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc., Inc. v. U.S. Industries Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). And under Rule 56(c)(4), an affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. In any event, even considering Bell's declaration, summary judgment in Defendants' favor is warranted. Accordingly, the motion to strike is denied as moot.

[10] Defendants contend that to the extent Bell purports to offer expert opinions as to patients' treatment, the opinions are inadmissible due to her failure to timely disclose herself as an expert and explain her qualifications and the methodology used to reach her opinions. (Dkt. 177 at p. 10); *see Rink v. Cheminova*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). Alternatively, they contend that she cannot offer an opinion as a lay witness because it would be impermissibly "based on scientific, technical, or other specialized knowledge." (Dkt. 177 at p. 11); *see* Fed. R. Evid.

CGCC's interdisciplinary care team and each patient's attending physician determined the length of a patient's stay at CGCC, the patient's RUG score, and whether therapy was necessary. (Dkt. 177-2 ¶¶ 12, 25-26); (Dkt. 177-3 at pp. 73-74); (Dkt. 177-1 at pp. 19-21). Additionally, a therapy company assessed patients to determine if therapy was necessary. (Dkt. 177-3 at pp. 73-74). Accordingly, even assuming that Bell's medical opinion is admissible, her averments constitute, at best, an unsupported difference of opinion as to the appropriate treatment for certain patients. This does not satisfy the requirement of falsity under the FCA.[11] *See, e.g., AseraCare, Inc.*, 938 F.3d at 1297 ("[A] reasonable difference of opinion among physicians reviewing medical documentation *ex post* is not sufficient on its own to suggest that those judgments—or any claims based on them—are false under the FCA.").

Additionally, Bell does not provide CGCC's billing records detailing the information submitted for payment as to specific patients. And she did not work in CGCC's billing department or ever see a bill submitted to Medicare. (Dkt. 177-3 at pp. 27-29, 37). Medical and billing content on a claim form is especially important in the context of her claims that unnecessary medical services were billed. *See United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 708 (11th Cir. 2014) (noting that for claims alleging that medical services were unnecessary, "representative claims with particularized medical and billing content matter more, because the

---

70[1]. In any event, this issue is immaterial to the resolution of Defendants' motion.

[11] Defendants contend that the FCA requires "proof of an objective falsehood," relying on *AseraCare Inc.* (Dkt. 177 at pp. 7-8). The United States has argued that *AseraCare*'s requirement of an objective falsehood is limited to claims based on false certifications for hospice services. (Dkt. 122). Other circuits have noted that "the Eleventh Circuit was not asked whether a medical opinion could ever be false or fraudulent, but whether a reasonable disagreement between physicians, *without more*, was sufficient to prove falsity at summary judgment." *See Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1118-19 (9th Cir. 2020) (emphasis in original). In any event, even if objective falsity is not required, Bell has offered no evidence apart from her unsupported opinion that treatment as to certain patients was unnecessary.

9

falsity of the claim depends largely on the details contained within the claim form—such as the type of medical services rendered, the billing code or codes used on the claim form, and what amount was charged on the claim form for the medical services").

By contrast, the "resident account detail" documents produced by Defendants merely identify transaction and service dates, general descriptions of services, and amounts and balances due. *See* (Dkt. 177-5). Bell provides no evidence explaining the significance of the information, which in any event does not support her allegations that false claims were submitted. Bell also relies on a purported "spreadsheet provided by the United States containing compiled billing statistics of certain of Defendants' patients during the term of [her] employment."[12] (Dkt. 183 at p. 2). However, as Defendants observe, she has offered no evidence as to "who created it, how it was created, why it was created, or what it means." (Dkt. 177 at p. 14). The spreadsheet appears to include billing provider information, a "patient identifier" which does not identify the patients in Bell's declaration, a "claim from" and "claim through" date, a "type of bill cd" with description, a "revenue cd" with description, a "procedure cd" with description and modifiers, quantities and amounts billed, and an amount paid to the provider. *See* (Dkt. 177-6). Again, Bell provides no evidence explaining the significance of this information or how it relates to her averments that unnecessary services were rendered and that false claims were submitted as to specific patients.

Rather than present specific medical and billing information, Bell asserts that, as to the seven patients, "any and all" RUG level treatments were "false." *See* (Dkt. 177-4 ¶ 10). However, in addition to failing to support this assertion, she fails to distinguish between false claims and

---

[12] The parties dispute whether the spreadsheet is inadmissible hearsay and whether it can be reduced to admissible evidence at trial. *See* (Dkt. 183 at p. 10); (Dkt. 177 at p. 14). Even if the spreadsheet is considered, summary judgment in Defendants' favor is appropriate.

claims that were properly submitted. For example, she avers that "[a]ll of CGGC's therapy billing to Medicare for [W.S.] is false," although she acknowledges that he was "originally on RUG level A" before being "improperly" moved to level VA. (Id. ¶ 10(f)). As to JCIL, Bell avers that his treatment was unnecessarily increased "[a]fter *about* 60 days," but also that "*all* billing after the first 60 days is false." (Id. ¶ 10(d)). As to patients whom she avers could not "tolerate any therapy" or for whom "there was no room for improvement," she does not specify when it was discovered that the patient could not tolerate therapy or that there was no room for improvement. (Id. ¶¶ 10(a), (b), (d)). And she does not explain why treatment was "unnecessary" as to patients who were "alert and stable," (Id. ¶ 10(e)), or why all claims submitted as to a patient were false when therapy was "not indicated." This lack of specificity highlights the importance of detailed billing and medical records, absent here.[13] In summary, Bell has not shown a genuine issue of material fact as to whether a false claim was submitted or a false statement was made.

*Knowledge*

Bell has not demonstrated that Defendants knowingly submitted a false claim or made a false statement with scienter. As the Eleventh Circuit has explained, "knowingly" is defined as

> "actual knowledge," "deliberate ignorance," or "reckless disregard." Although proof of a specific intent to defraud is not required, the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence. . . . ["Reckless disregard"] was added to ensure that "knowingly" captured the ostrich type situation where an individual has buried his head in the sand and

---

[13] Bell contends that Defendants failed to produce documents during discovery. (Dkt. 176 at pp. 1, 4-5). However, as noted in the order denying her request to stay a ruling on Defendants' motion for summary judgment, the record reflects that she did not diligently seek discovery. An earlier stay on discovery was lifted on January 6, 2020, and Bell did not serve her first request for production of documents until August 4, 2020. (Dkt. 131); (Dkt. 182-1 at p. 10). In response to Defendants' motion for a protective order on August 13, 2020, the parties stipulated that Defendants would produce authenticated copies of documents attached to their motion for sanctions. (Dkts. 138, 150, 157, 158, 159). Bell did not serve a second request for production of documents, file a motion to compel discovery, or seek to extend the November 5, 2020, discovery deadline. (Dkt. 184 at p. 4). Notwithstanding, she filed a motion for summary judgment "both on liability and damages." (Dkt. 171 at p. 1).

> failed to make simple inquiries which would alert him that false claims are being submitted. Liability attaches to only those who act in gross negligence—those who fail to make such inquiry as would be reasonable and prudent to conduct under the circumstances.

*Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (internal citations, brackets, and some quotation marks omitted).

Bell does not present evidence establishing Defendants' actual knowledge, deliberate ignorance, or reckless disregard as to the submission of a false claim. First, although she avers that she "brought [her] concerns to Joyce Plourde in or around early 2015" and that Plourde "responded that this is just how Cross operates and refused to make any changes," this does not establish knowledge.[14] (Dkt. 177-4 ¶ 4). Rather, at best, Bell's averments show that CGCC's MDS consultant was aware that one of CGCC's nurses disagreed with treatment plans made by its interdisciplinary care team, physicians, and the therapy company. *Cf. Life Care Centers of Am., Inc.*, 114 F. Supp. 3d at 567-68 (collecting cases and noting that courts have not permitted a "collective knowledge" theory in FCA cases). She also testified that although she never told therapists that therapy was unnecessary, she asked a "rehab" and "therapy manager" "why is everybody . . . using their hundred days." (Dkt. 177-3 at pp. 54, 79, 91). This is insufficient to demonstrate that Defendants knowingly submitted a false claim.

Further, Bell avers that "[o]n at least one occasion, Mr. Cross questioned a patient's RUA rug level angrily and directed [her] to increase the RUG level of the patient, without any analysis

---

[14] In her motion for summary judgment, Bell asserts that she "told Joyce Plourde many times of over-treatment and over-stays, as did other nurses, but Ms. Plourde ignored Relator." (Dkt. 171 at p. 16). Plourde averred that she did not recall any such conversations. (Dkt. 177-2 ¶ 28). Further, Bell alleged in her complaint that when she "complained about this obvious fraud, Karl Cross insisted on billing Medicare for the unnecessary medical services." (Dkt. 127-2 ¶ 4). However, during her deposition, she testified that she never spoke to Cross about unnecessary therapy at CGCC. (Dkt. 177-3 at p. 56). Any related factual disputes are immaterial to the determination that summary judgment in Defendants' favor is warranted.

or justification." (Dkt. 177-4 ¶ 5). However, she provides no detail as to the identity or medical history of the patient. And she fails to explain how Cross' failure to provide her with an "analysis or justification" to support increasing the RUG level establishes that a false claim was knowingly submitted. Similarly, although she testified that Cross sent emails questioning RUG scores, she has not shown that any RUG scores were changed after the emails.[15] (Dkt. 177-3 at pp. 40-41). In summary, absent a genuine dispute as to whether Defendants knowingly submitted a false claim or made a false statement with scienter, summary judgment in Defendants' favor is warranted.

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (Dkt. 177) is **GRANTED**. Relator Bell's Motion for Partial Summary Judgment (Dkt. 171) is **DENIED**. Defendants' Motion to Strike Bell's Declaration (Dkt. 174) is **DENIED as moot**. The Pretrial Conference scheduled for March 4, 2021 is cancelled. The Clerk is directed to enter judgment in favor of Defendants, terminate any pending motions, and close the file.

**DONE AND ORDERED** this 1st day of March, 2021.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record

---

[15] In contrast, in *Ruckh*, the Eleventh Circuit determined that summary judgment was inappropriate on a "cause to be presented" theory of liability where evidence showed that employees were instructed to increase RUG levels "as high as possible so that revenue, the reimbursement, was high," were "pressured routinely to elevate RUG scores irrespective of the services provided," and were "reprimand[ed] . . . constantly for failing to meet RUG budgets." 963 F.3d at 1107-08. And instead of unnecessary therapy, the false claims were based on "upcoding," meaning "representing to Medicare that [the skilled nursing facilities] provided a greater number of therapy minutes" and "more extensive nursing services than reflected in their residents' medical records," and "ramping," which is "the impermissible, artificial timing of services to coincide with Medicare's regularly scheduled assessment periods and thereby maximize reimbursements." *Id.* at 1104-05. Bell has not presented evidence of upcoding or ramping. And although she testified that she observed patients refusing therapy, she does not know whether the "therapist actually billed for therapy that the resident refused." (Dkt. 177-3 at p. 102).